FILED
U.S. DISTRICT COURT
DISTRICT OF WYOMING
2019 JUL -9 AM 9:26
STEPHAN HARRIS, CLERK
CASPER

UNITED STATES DISTRICT COURT
DISTRICT OF WYOMING

TRINITY TEEN SOLUTIONS, INC., a Wyoming Corporation,

Plaintiff,

v.

UNITED BEHAVIORAL HEALTH, a California Corporation, d/b/a OPTUM,

Defendant.

Case No. 19-CV-45-SWS

## ORDER GRANTING PLAINTIFF'S MOTION FOR RECONSIDERATION AND REMANDING CASE TO STATE COURT

This lawsuit was originally filed in state court and removed by Defendant to federal court. Plaintiff filed a Motion to Remand seeking to return the lawsuit to state court (Doc. 14), which the Court denied (Doc. 23). Plaintiff now moves for reconsideration of that decision. (Doc. 25.) Defendant filed an opposition (Doc. 31) and Plaintiff replied (Doc. 37). Having considered the parties' arguments and reviewed the record herein, the Court finds reconsideration is warranted and the case should be remanded back to state court for lack of federal subject-matter jurisdiction.

## BACKGROUND

Plaintiff Trinity Teen Solutions, Inc., operates a residential treatment center in Wyoming that provides behavioral and mental health services to teenage women. (Doc. 1 at p. 9.) Defendant United Behavioral Health is an insurance company. (*Id.* at pp. 9-

11.) Plaintiff provided treatment services to N.E. in 2016 upon the request and authorization of N.E.'s parent or legal guardian. (*Id.* at p. 10; Doc. 19-3.) At the time, N.E. was covered under a health insurance policy issued and administered by Defendant[1] ("the Plan"). (Doc. 1 at p. 13.) Defendant paid over $113,000 to Plaintiff for N.E.'s treatment, with the last payment occurring in November 2016. (*Id.* at p. 11.) Since then, though, Defendant has demanded Plaintiff return some of that money for alleged overpayment (*id.*), and Plaintiff refuses. N.E.'s parent or guardian assigned any claim to the Plan benefits to Plaintiff. (Doc. 15 at p. 4; Doc. 19-3.)

Plaintiff then filed a complaint in state court seeking declaratory judgment under Wyoming Statute § 1-37-103. (Doc. 1 at pp. 15-18.) Defendant timely removed the case to federal court, asserting the case presents a question of federal law under the Employer Retirement Income Security Act of 1974 (ERISA). (Doc. 1.) After the Court denied Plaintiff's first motion to remand the case back to state court (Doc. 23), Plaintiff filed the instant motion for reconsideration (Doc. 25). Contrary to its earlier decision, the Court now concludes Plaintiff could not bring the instant claim under ERISA § 502(a)(1)(B); consequently, federal-question jurisdiction is lacking.

## STANDARD FOR RECONSIDERATION

Authority to reconsider an interlocutory order, such as the prior order denying remand in this case, exists solely under Rule 54(b). *See SFF-TIR, LLC v. Stephenson*, 264 F. Supp. 3d 1148, 1218-19 (N.D. Okla. 2017) (differentiating reconsideration of final

---

[1] Defendant United Behavioral Health is "the plan's mental health administrator." (Doc. 18 at p. 1 n.1.) The claims administrator for the insurance plan is United Healthcare Services, Inc., which will be added as a party pursuant to stipulation. (*Id.*) For purposes of this Order, the Court will refer to both generically as "Defendant."

orders and reconsideration of interlocutory orders); *In re Winkle*, No. 13-11743 T7, 2016 WL 920393, at *1 (Bankr. D.N.M. Mar. 10, 2016) (unpublished) ("Rule 54(b) provides the mechanism for reconsidering interlocutory orders."). "The Tenth Circuit has analyzed motions to reconsider interlocutory orders, like this one, under Rule 54(b) and looked to the standard used to review Fed. R. Civ. P. 59(e) motions for guidance in addressing those motions to reconsider." *Volt Asset Holdings Tr. XVI v. Martinez*, No. 13-508 KG/KK, 2015 WL 11089507, at *1 (D.N.M. Aug. 21, 2015) unpublished) (citing *Ankeney v. Zavaras*, 524 Fed. Appx. 454, 458 (10th Cir. 2013)).

> A Rule 59(e) movant carries the burden of demonstrating that the Court should alter or amend a judgment. *See, e.g., Winchester v. Wilkinson*, 2015 WL 2412175, at *2 (E.D. Okla.). Rule 59(e) relief is appropriate if there is new controlling law, new evidence not available previously, or a "need to correct clear error or prevent manifest injustice." *Ankeney*, 524 Fed. Appx. at 458 (quoting *Servants of the Paraclete v. Does*, 204 F.3d 1005, 1012 (10th Cir. 2000)). Rule 59(e) does not allow a losing party to "revisit issues already addressed or advance argument that could have been raised in prior briefing." *Servants of the Paraclete*, 204 F.3d at 1012. The Court has discretion in deciding whether to grant or deny a motion to reconsider. *Hancock v. City of Oklahoma City*, 857 F.2d 1394, 1395 (10th Cir. 1988).

*Id.* The Court reviews this matter because of the prime importance of subject matter jurisdiction. *See Carlsbad Tech., Inc. v. HIF Bio, Inc.*, 556 U.S. 635, 639 (2009) ("Subject matter jurisdiction defines the court's authority to hear a given type of case."). This review discloses the need to correct clear legal error and enforce the Plan's contractual terms.

## **STANDARD FOR REMAND FOR LACK OF JURISDICTION**

Title 28 U.S.C. § 1447(c) requires a federal court to remand an action back to state court "before final judgment" whenever "it appears that the district court lacks subject

matter jurisdiction." Subject matter jurisdiction "represents 'the extent to which a court can rule on the conduct of persons or the status of things.'" *Carlsbad Tech*, 556 U.S. at 639 (quoting *Black's Law Dictionary* 870 (8th ed. 2004)).

"A defendant may remove a civil action initially brought in state court if the federal district court could have exercised original jurisdiction." *Salzer v. SSM Health Care of Oklahoma Inc.*, 762 F.3d 1130, 1134 (10th Cir. 2014) (citing 28 U.S.C. § 1441(a)). Subject matter jurisdiction here depends upon the existence of a "federal question" and the doctrine of "complete preemption."

> "One category of cases over which the district courts have original jurisdiction are 'federal question' cases; that is, those cases 'arising under the Constitution, laws, or treaties of the United States.'" *Metro. Life Ins. Co. v. Taylor*, 481 U.S. 58, 63, 107 S. Ct. 1542, 95 L.Ed.2d 55 (1987) (quoting 28 U.S.C. § 1331). In determining the existence of federal question jurisdiction, courts are "guided generally by the 'well-pleaded complaint' rule, under which a suit arises under federal law only when the plaintiff's statement of his own cause of action shows that it is based on federal law." *Turgeau v. Admin. Rev. Bd.*, 446 F.3d 1052, 1060 (10th Cir.2006) (quotation omitted). Thus, as a general matter, the plaintiff "may prevent removal to federal court by choosing not to plead a federal claim even if one is available." *Id.* (quotation and alteration omitted).

*Id.* Under the well-pleaded complaint rule, "a suit arises under federal law 'only when the plaintiff's statement of his own cause of action shows that it is based' on federal law." *Devon Energy Prod. Co. v. Mosaic Potash Carlsbad, Inc.*, 693 F.3d 1195, 1202 (10th Cir. 2012) (citations omitted).

Complete preemption is an exception to the general rule that a plaintiff can prevent removal through the well-pleaded complaint rule.

> The doctrine of "complete preemption," however, is "a corollary or an exception to the well pleaded complaint rule," under which "a state law

cause of action may be removed to federal court on the theory that federal preemption makes the state law claim necessarily federal in character." *Id.* at 1061 (quotation omitted). "[O]nly a few federal statutes [] so pervasively regulate their respective areas that they have complete preemptive force; ERISA is one." *Hansen v. Harper Excavating, Inc.*, 641 F.3d 1216, 1221 (10th Cir. 2011).

*Salzer*, 762 F.3d at 1134.

The question presented here, as in *Salzer*, is whether Plaintiff's claim is completely preempted by ERISA.

> "[C]auses of action within the scope of the civil enforcement provision of [ERISA] § 502(a) [are] removable to federal court." *Taylor*, 481 U.S. at 66, 107 S.Ct. 1542. In *Aetna Health Inc. v. Davila*, 542 U.S. 200, 124 S.Ct. 2488, 159 L.Ed.2d 312 (2004), the Supreme Court laid out a two-part test for determining whether a claim falls within the scope of the civil enforcement provision: "[I]f an individual, at some point in time, could have brought his claim under ERISA § 502(a)(1)(B), and where there is no other independent legal duty that is implicated by a defendant's actions, then the individual's cause of action is completely pre-empted by ERISA § 502(a)(1)(B)." *Id.* at 210, 124 S.Ct. 2488. The civil enforcement provision allows a plan participant or beneficiary to bring a civil action "to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan." ERISA § 502(a)(1)(B), 29 U.S.C. § 1132(a)(1)(B).

*Id.* at 1134–35.

## ANALYSIS

In contrast to its earlier decision, the Court now concludes Plaintiff's claim does not fall within the scope of the civil enforcement provision of ERISA because it does not satisfy the first step of the two-part test of *Davila*. Therefore, federal-question jurisdiction is lacking, and the case must be remanded to state court where it was originally filed.

The first step of *Davila* asks whether the claims "are brought by an individual who has standing to assert rights under ERISA § 502(a)(1)(B)." *Montefiore Med. Ctr. v. Teamsters Local 272*, 642 F.3d 321, 328 n.7 (2d Cir. 2011). To have standing to bring a claim under ERISA § 502(a)(1)(B), the plaintiff must be a "participant or beneficiary" under the ERISA-governed Plan. 29 U.S.C. § 1132(a)(1)(B). Plaintiff here was the treatment provider, not a direct Plan participant. Thus, to have standing to bring a civil action to enforce its rights under the Plan, Plaintiff must qualify as a beneficiary, which is "a person [or entity] designated by a participant, or by the terms of any employee benefit plan, who is or may become entitled to a benefit thereunder." 29 U.S.C. § 1002(8).

Plaintiff acknowledges it obtained an assignment of benefits from the Plan participant (N.E.'s parent/guardian), through which Plaintiff was designated to receive any Plan benefits owed to the Plan participant. (Doc. 15 at p. 4; *see also* Doc. 19-3 at pp. 2, 4 (assignment of rights to receive insurance payments as part of the Financial Contract and Fee Agreement entered into between Plaintiff and N.E.'s parent/guardian).)[2]

However, many ERISA plans contain anti-assignment provisions, which are generally enforced. *See St. Francis Reg'l Med. Ctr. v. Blue Cross & Blue Shield of Kansas, Inc.*, 49 F.3d 1460, 1464 (10th Cir. 1995) ("We interpret ERISA as leaving the assignability of benefits to the free negotiations and agreement of the contracting parties."). In its previous Order Denying Remand, the Court determined, "The Plan at

---

[2] "[W]hen determining if the requirements for federal jurisdiction are met in a matter removed from state court, a district court may consider evidence submitted after removal." *Firebird Structures, LCC v. United Bhd. of Carpenters & Joiners of Am., Local Union No. 1505*, 252 F. Supp. 3d 1132, 1156 (D.N.M. 2017); *see also McPhail v. Deere & Co.*, 529 F.3d 947, 956 (10th Cir. 2008) (considering extra-complaint documents to determine the amount in controversy for diversity jurisdiction).

issue in this case does not prohibit assignments, though." (Doc. 23 at p. 5.) The Court based this on a passage from the Plan's "Summary Plan Description" or "SPD" (filed at Doc. 19-1), which discussed the requirements for "a valid assignment of Benefits under the Plan." (Doc. 19-1 at p. 85.) By itself, this obviously suggested that the Plan permitted assignments, provided certain requirements were satisfied.

After the Court issued that order, though, Plaintiff received another Plan document in discovery from Defendant, this one titled "Celanese Health and Welfare Benefits Program and Summary Plan Description" (filed at Doc. 27-1). The Introduction section of this document describes the purpose of the Plan as consolidating multiple plans into a single, comprehensive plan that is sometimes called a "wrap" or "umbrella" plan. (Doc. 27-1 at p. 4.) For that reason, Defendant refers to this new document as the "Wrap Agreement" or just "Wrap" (Doc. 31 at p. 2), and the Court will follow suit to keep it separate from the SPD.

Significantly, Section 8.3 of the Wrap Agreement prohibits a person from assigning any of their rights provided by the Plan. (Doc. 27-1 at p. 32 ("No benefit, right or interest of any person hereunder will be subject to ... alienation ... transfer, [or] assignment ..., except as otherwise required by law.").) Consequently, there is a conflict on assignability between the SPD (which the Court earlier relied upon) and the Wrap Agreement.

The question therefore becomes which document controls, and perhaps expectedly, the parties disagree on the answer. (*Compare* Doc. 26 at p. 3 *with* Doc. 31 at

issue in this case does not prohibit assignments, though." (Doc. 23 at p. 5.) The Court based this on a passage from the Plan's "Summary Plan Description" or "SPD" (filed at Doc. 19-1), which discussed the requirements for "a valid assignment of Benefits under the Plan." (Doc. 19-1 at p. 85.) By itself, this obviously suggested that the Plan permitted assignments, provided certain requirements were satisfied.

After the Court issued that order, though, Plaintiff received another Plan document in discovery from Defendant, this one titled "Celanese Health and Welfare Benefits Program and Summary Plan Description" (filed at Doc. 27-1). The Introduction section of this document describes the purpose of the Plan as consolidating multiple plans into a single, comprehensive plan that is sometimes called a "wrap" or "umbrella" plan. (Doc. 27-1 at p. 4.) For that reason, Defendant refers to this new document as the "Wrap Agreement" or just "Wrap" (Doc. 31 at p. 2), and the Court will follow suit to keep it separate from the SPD.

Significantly, Section 8.3 of the Wrap Agreement prohibits a person from assigning any of their rights provided by the Plan. (Doc. 27-1 at p. 32 ("No benefit, right or interest of any person hereunder will be subject to ... alienation ... transfer, [or] assignment ..., except as otherwise required by law.").) Consequently, there is a conflict on assignability between the SPD (which the Court earlier relied upon) and the Wrap Agreement.

The question therefore becomes which document controls, and perhaps expectedly, the parties disagree on the answer. (*Compare* Doc. 26 at p. 3 *with* Doc. 31 at

p. 8.) Based on the following discussion, the Court concludes the anti-assignment provision in the Wrap Agreement controls in this matter.

The Wrap Agreement explains as follows:

> [T]he entire Plan document is actually a series of documents, consisting of this document plus the various contracts and/or booklets that describe the specific benefits, rights and features under the various welfare benefit programs that are consolidated in this Plan. Together, this and such other documents comprise both the official "Plan document" and the "Summary Plan Description."

(Doc. 27-1 at p. 4.) Concerning the additional plan documents, the Definitions section of the Wrap Agreement defines "Component Document" as "a written document identified in the Appendices and incorporated herein by reference …." (*Id.* at p. 5.) Of particular relevance here, the SPD is specifically identified as a "Component Document" in Appendix I of the Wrap Agreement. (*Id.* at p. 48 (listing "UnitedHealthcare's Summary Plan Descriptions for each applicable Active or Retiree medical option" as a Component Document).) Finally, Section 8.1 describes how to interpret the Plan:

> This Plan document, including the attached Appendices and Component Documents incorporated herein by reference, sets forth the provisions of this Plan. This Plan will be read in its entirety and not severed except as provided in Section 8.8. **The provisions of this document will control over the provisions of any Component Document, except to the extent this document expressly provides to the contrary.**

(Doc. 27-1 at p. 32 (emphasis added).)

In certain subjects, the Wrap Agreement expressly provides that a Component Document controls over the Wrap Agreement. For example, Defendant points out that the Wrap Agreement states, "If the reimbursement and subrogation terms of an applicable Component Document supply greater rights, the terms of such Component Document

will apply." (Doc. 31 at p. 7 (quoting Section 6.1 of the Wrap Agreement).) And the SPD does in fact provide greater rights, thus controlling on the matter of reimbursement and subrogation. (*See id.* at pp. 7-8.)

However, nowhere does the Wrap Agreement expressly provide that a Component Document controls on the subject of assignment. Defendant extrapolates, "Because benefits under the SPD are subject to a reimbursement claim by the Plan, and the SPD grants greater rights than the Wrap, pursuant to the terms of the Wrap, the SPD, as a whole, controls." (Doc. 31 at p. 8.) This is a leap too great. Defendant's interpretation does not carry the day because it ignores the directive of Section 8.1 of the Wrap Agreement. (*See* Doc. 27-1 at p. 32 (stating the Wrap Agreement "will control over the provisions of any Component Document, except to the extent this document expressly provides to the contrary").) The Wrap Agreement sets forth the parties' rights as to assignment in Section 8.3, and, unlike the section on reimbursement and subrogation, there is nothing in the Wrap Agreement expressly ceding control over assignments to a Component Document. Applying the plain and unambiguous language found in the Wrap Agreement regarding assignments and Plan interpretation, the Court concludes the anti-assignment provision of the Wrap Agreement controls, and prohibits, any assignment.

Plaintiff was the treatment provider and, without a valid assignment, cannot be considered a "participant or beneficiary," 29 U.S.C. § 1132(a)(1), under the Plan. Due to the Plan's unambiguous bar on assignments, the assignment from the Plan participant to Plaintiff in this case does not qualify Plaintiff as a "beneficiary" for purposes of bringing

a civil enforcement action under ERISA. "Based on the plain language of this provision, [Plaintiff's] acceptance of an assignment was ineffective—a legal nullity." *McCulloch Orthopaedic Surgical Servs., PLLC v. Aetna Inc.*, 857 F.3d 141, 147 (2d Cir. 2017); *see also Physicians Multispecialty Grp. v. Health Care Plan of Horton Homes, Inc.*, 371 F.3d 1291, 1295 (11th Cir. 2004) ("[W]e are persuaded by the reasoning of the majority of federal courts that have concluded that an assignment is ineffectual if the [ERISA] plan contains an unambiguous anti-assignment provision.") (collecting cases).

Defendant notes that N.E.'s parent/guardian also signed a Durable Power of Attorney for Insurance Clients in Plaintiff's favor, which contained a broad assignment of rights to pursue and obtain insurance payments, including "instituting and prosecuting and/or defending litigation." (Doc. 19-3 at p. 8.) Defendant contends, "Here, the durable power of attorney itself includes an irrevocable assignment of benefits—meaning [Plaintiff] was given an interest in the ERISA benefits ... and thus [Plaintiff] stands in the insured's shoes and has standing to sue in its name under ERISA as a beneficiary of the claims paid by the Plan based on the assignment." (Doc. 31 at p. 10.) Defendant presents no argument or authority, though, that would suggest this assignment, simply due to its inclusion within a durable power of attorney, somehow overcomes the anti-assignment provision of the Wrap Agreement. The Court finds no basis for it to do so. Plaintiff does not have standing as a "participant or beneficiary" to assert a civil enforcement action under ERISA in this case, and the Court consequently lacks subject-matter jurisdiction.

## CONCLUSION AND ORDER

The first step of the two-part *Davila* test is not satisfied here because Plaintiff lacks standing to have brought this claim under ERISA § 502(a)(1)(B) at some point in time. The cause of action in this case is not completely preempted by ERISA § 502(a)(1)(B), and the doctrine of complete preemption does not overcome the well-pleaded complaint rule in this instance. The Court lacks subject-matter jurisdiction over this case, and it must be remanded to state court for further proceedings. *See Hill v. Vanderbilt Capital Advisors, LLC*, 702 F.3d 1220, 1222, 1224 (10th Cir. 2012) (dismissing appeal from remand order "[b]ecause we conclude that standing can be colorably characterized as an issue of subject matter jurisdiction" and noting that Tenth Circuit "has repeatedly characterized standing as an element of subject matter jurisdiction").

**IT IS THEREFORE ORDERED** that Plaintiff's Motion for Reconsideration of this Court's Order Dated April 22, 2019 Denying Plaintiff's Motion to Remand (Doc. 25) is **GRANTED**. The Court grants the request for reconsideration due to the need to correct its earlier legal error as to subject-matter jurisdiction.

**IT IS FURTHER ORDERED** that the Court lacks federal-question jurisdiction over this case, and this civil action is hereby **REMANDED** back to state court where it was originally filed for further proceedings.

**DATED:** July 9th, 2019.

_____
Scott W. Skavdahl
United States District Judge